IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


MARY JO and RALPH STEVENS,

              Plaintiff,

      v.

HOLLYWOOD TOWERS and
CONDOMINIUM ASSOCIATION, *et
al.*,

            Defendants.

Case No. 11 C 1657

Hon. Harry D. Leinenweber


## MEMORANDUM OPINION AND ORDER

Plaintiffs Mary Jo and Ralph Stevens (hereinafter, collectively, the "Plaintiffs") brought the instant suit contending that their Condo Board's refusal to accommodate Mary Jo's need for an emotional support animal forced them to sell their condo. The Defendants, Hollywood Towers Condominium Association, Joseph A. Armenio, Sudler Building Services LLC, and Sudler and Co., doing business as Sudler Property Management (hereinafter, collectively, the "Defendants") have moved to dismiss for failure to state claims upon which relief can be granted. For the reasons stated, the motion is denied as to the claims brought by Plaintiffs in Counts I and III, but granted as to the remainder of the Complaint. Additionally, the Court dismisses Sudler Building Services from the case.

## I. <u>BACKGROUND</u>

The following facts are taken from the Plaintiffs' Amended Complaint and will be considered true for the purposes of this motion. Plaintiffs owned a condominium in the Hollywood Towers building, a 541-unit building that has a no-pet policy, from 2008 to July 28, 2011.

In March 1999, Mary Jo Stevens ("Mary Jo") was in an automobile accident in which she suffered a head injury that left her disabled. As a result, she suffers unpredictable panic attacks during which she stops breathing. In November 2009, Mary Jo's doctor, Dr. Shayna Mansfield, prescribed her an emotional support animal to assist Mary Jo with her panic disorder. Mary Jo then wrote an e-mail to the Hollywood Towers building manager, Joseph Armenio ("Armenio"), on November 11, 2009, informing him of her prescription for a service animal. She volunteered to keep the dog in a carrier in the public areas of the building, although she alleges that she subsequently realized this would not be practicable.

On November 24, 2009, Armenio responded to Mary Jo's e-mail, seeking four items in order to approve the animal. Armenio wanted: (1) proof of the service animal's training; (2) a letter explaining how the animal's specialized training would help Mary Jo deal with her condition; (3) a letter specifying the doctor's qualifications for prescribing the animal; and (4) a letter prescribing the use of the animal.

In his e-mail, Armenio told Mary Jo that the Hollywood Towers Condominium Association (the "Condo Board") would require that the emotional support animal be kept in a container at all times when in the common areas of the building. He also told Mary Jo she must enter and leave through the north and south entrances to the building instead of through the main entrance when accompanied by the animal. According to the Complaint, Armenio did not give Mary Jo or Ralph the keys to the north or south entrances. He also told Plaintiffs that when they were accompanied by the animal, they would be required to use the service elevator, which has limited hours of operation.

On November 25, 2009, Mary Jo e-mailed Armenio to let him know that her service animal, a dog, had arrived. She provided him with a copy of Mansfield's prescription for an emotional service therapy dog. The prescription stated that Mary Jo is a person with a disability resulting from a head injury and that her disability limits a major life activity. Mary Jo also told Armenio that it was unreasonable to require her to use the north and south entrances because the north entrance was usually locked from the outside and south entrance was always locked from the outside.

For the next four months, Plaintiffs did not receive any further communication from Armenio or the Condo Board. In the meantime, she obtained a different emotional support dog. The dog weighs less than 12 pounds and in the spring of 2010 was trained as a psychiatric service dog in accordance with U.S. Department of Justice regulations. He helps Mary Jo regulate her breathing, calms her, and

helps prevent panic attacks.  Since she got the dog, Mary Jo has rarely been away from it.  Even before the dog was trained as a service animal, it was able to detect her stress-related breathing problems and lay on her chest to calm her, according to Plaintiffs' Complaint.

Mary Jo alleges that after she got the dog, she and her husband observed that the staff of Hollywood Towers stared at her when she entered and left the lobby and "also appeared to unnecessarily monitor and document her comings and goings from the building." Pl.'s Compl. ¶ 31.  Mary Jo also says she was repeatedly accosted and questioned by other residents about her need for a dog and the nature of her disability.  She found these questions humiliating and intrusive.

On March 8, 2010, Armenio e-mailed Plaintiffs about the emotional support dog, informing them that he had received reports that they had carried their dog into and out of the main entrance to the building without a carrier.  He stated that the building lobby was "off limits to dogs of any kind." Pls.' Compl. ¶ 33.  Plaintiffs responded that it was impossible to keep the dog in the carrier at all times.  They also told Armenio that because the other outside doors were locked, the only way to enter or exit the building was through the main lobby.  Armenio responded by insisting that Plaintiffs use the service doors.

On March 11, 2010, Ralph Stevens ("Ralph") met with Armenio to discuss Mary Jo's need for an accommodation.  Armenio told him that

he and his wife were not allowed to have the emotional support animal in the common areas of the building, including the main lobby, the main lobby elevators, the mail room, and the laundry room. Armenio reiterated that the dog had to be in a container when he was being moved through the building. He also reiterated that Plaintiffs must use the north or south entrances to access the building when accompanied by the support animal.

Ralph protested these conditions and told Armenio that Mary Jo could not carry the dog in a container when she was in the building's common areas because the dog could not perform its functions if it was in a container. Also, because of her disability and physical limitations, it was impossible for her to manage a carrier and her other belongings any time she enters or leaves the building, or when she needs to use the laundry room or other building facilities.

Ralph also told Armenio it was unreasonable for Mary Jo to use the service entrances whenever she had her emotional support dog with her. He also told Armenio that the building's south door was locked with no handle on the outside and no means of reentry except propping the door open, while the north door was locked after 10:00 p.m. Ralph also told Armenio that the use of those side entrances was problematic because it required Mary Jo to walk a greater distance and put her at risk of being hit by oncoming traffic. Because of her disability, Mary Jo suffers increased anxiety in high traffic areas and suffers increased anxiety for her personal safety when using doors that are isolated and infrequently used by other tenants.

Additionally, Ralph told Armenio that he and his wife were being harassed by residents and staff about their emotional support animal. He requested that Hollywood Towers to send a letter to all residents informing them that there was an emotional support animal in the building that was exempt from the no-dog rules. Plaintiffs also told Armenio that other residents of the building were keeping dogs in violation of the no-dog rule, but that those animals had been tolerated. Armenio rejected their requests.

The next day, on March 12, 2010, Plaintiffs wrote a letter to Armenio and the Condo Board again requesting unrestricted access for the emotional support animal as a reasonable accommodation for her disability. They informed the Condo Board that they felt intimidated and harassed by the employees and tenants of Hollywood Towers, who regularly questioned them about the service animal. They requested that the Condo Board advise and train the staff on the law regarding service animals and provide a written notice to the residents that there was an emotional support animal in the building. The Condo Board did not initially respond, and Mary Jo continued to "be accosted and interrogated by building staff about the emotional support animal." Pl.'s Compl. ¶ 45. On April 3, 2010, Plaintiffs again wrote Armenio and requested a response to their letter of March 12, 2010.

On April 20, 2010, Armenio responded on behalf of the Condo Board and told Plaintiffs that they must keep the dog in a carrier while in the common areas of the building and use the north or south

side doors when accompanied by the animal. Armenio said that the staff had been trained and refused to notify residents about the emotional support animal until Plaintiffs provided "tangible proof" of harassment. Armenio also told Plaintiffs that they had failed to provide proof of the animal's training.

A week later, on April 27, 2010, Armenio confronted Mary Jo in the lobby of the building about bringing the dog into the common areas of the building. She felt harassed and intimidated by the public confrontation. The same day, Armenio gave Plaintiffs a written "Warning of Rules Violation" for bringing the animal into the building lobby and other common areas. The warning also said that Plaintiffs had failed to cooperate with the Condo Board in setting a reasonable accommodation.

On May 4, 2010, Plaintiffs filed a complaint with the Chicago Commission on Human Relations regarding the Condo Board's actions. On July 16, 2010, Mary Jo notified Armenio in writing that she was unable to carry the emotional support dog for long periods of time and would need to keep him on a leash in all public areas of the building. On August 10, 2010, she received a letter from the Condo Board's attorneys indicating that Plaintiffs had brought the service animal into the laundry room and requesting additional documentation of her need for an accommodation.

Plaintiffs contend that Defendants' actions in refusing her request for an accommodation and harassing them deprived them of their use and enjoyment of their home and amounted to a constructive

eviction. Plaintiffs sold their condo at a loss and moved out on July 28, 2011. They seek to recover for: (1) a failure to provide a reasonable accommodation under the Fair Housing Act Amendments of 1988, 42 U.S.C. § 3604(f) ("FHAA"); (2) interference or intimidation under the FHAA, 42 U.S.C. § 3617; (3) failure to provide a reasonable accommodation under the Illinois Human Rights Act ("IHRA"), 775 Ill. Comp. Stat. 5/3-101, *et seq.*; (4) nuisance; (5) intentional infliction of emotional distress; and (6) constructive eviction.

Defendants seek to dismiss the entire complaint pursuant to FED. R. CIV. P. 12(b)(6) for failure to state a claim upon which relief can be granted.

## II. <u>LEGAL STANDARD</u>

To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain "sufficient facts to state a claim for relief that is plausible on its face." *Justice v. Town of Cicero,* 577 F.3d 768, 771 (7th Cir. 2009). The Court accepts as true all well-pleaded facts alleged in the complaint and draws all reasonable inferences in a light favorable to the plaintiff. *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 556 (2007).

Although a complaint does not need detailed factual allegations, it must provide the grounds of the claimant's entitlement to relief, contain more than formulaic recitations of the elements of a cause of action, and allege enough to raise a right to relief above the speculative level. *See id.* at 555. Legal conclusions can provide a complaint's framework, but unless well-pleaded factual allegations

move the claims from conceivable to plausible, they are insufficient to state a claim. *Ashcroft v. Iqbal,* 129 S. Ct. 1937, 1950-51 (2009).

### III.  <u>ANALYSIS</u>

The Court will first consider Plaintiffs' claims under the FHAA and the IHRA.

### A.  Claims for Failure to Provide a Reasonable Accommodation under FHAA and IHRA (Counts I and III)

In Count I, Plaintiffs allege that Defendants violated 42 U.S.C. § 3604 (f)(3)(B) of the FHAA, which prohibits the "refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling."  In Count III, Plaintiffs bring a complaint for disability discrimination under the Illinois Human Rights Act, 775 Ill. Comp. Stat. 5/3-101, *et seq.*, which also alleges that Defendants failed to provide her with a reasonable accommodation.  Because Illinois courts have looked to the Fair Housing Act in interpreting the Illinois Human Rights Act, the Court will consider these claims to be subject to the same analysis. *See Norville v. Dep't of Human Rights*, 792 N.E.2d 825, 827 (Ill. App. Ct. 2003).

### 1.  *Whether Failure to Accommodate is Adequately Pleaded*

To establish a *prima facie* case for failure to accommodate under the FHAA, the plaintiff must show that:  (1) she suffers from a disability or is associated with someone with a disability; (2)

defendant knows of the disability or reasonably should be expected to know of it; (3) an accommodation may be necessary to give the plaintiff an equal opportunity to use and enjoy the dwelling; and (4) the defendant refused to make a reasonable accommodation. *Roseborough v. Cottonwood Apartments*, No. 94 C 3708, 1996 WL 490717, at *2 (N.D. Ill. Aug. 26, 1996).

Generally speaking, a "reasonable accommodation" is one that would not impose an undue hardship upon the entity making the accommodation and would not undermine the basic purpose that the requirement aims to achieve. *United States v. Vill. of Marshall,* 787 F.Supp. 872, 878 (W.D. Wis. 1991). The responsibility to offer a reasonable accommodation does not mean that a landlord must do everything possible to accommodate a disabled person; rather courts should undertake a cost-benefit analysis to determine what constitutes a reasonable accommodation. *Clabault v. Shodeen Mgmt.*, No. 05 C 5482, 2006 WL 1371460, at *2 (N.D. Ill. May 15, 2006). The burden is on the plaintiffs to show that an accommodation she seeks is reasonable on its face. *Oconomowoc Residential Programs v. City of Milwaukee*, 300 F.3d 775, 783 (7th Cir. 2002). If they can, the defendant must come forward with evidence of unreasonableness or undue hardship that would be caused by the particular accommodation. *Id.*

Here, Defendants argue that Plaintiffs have failed to state a claim because there can be no FHAA violation until a request for an accommodation is actually denied, and in this case Defendants allowed

Plaintiffs to keep the service animal.  Further, Defendants note that they were not obligated to provide Plaintiffs with the accommodation they requested, but merely with a reasonable accommodation.  *See Gile v. Am. Airlines*, 95 F.3d 492, 499 (7th Cir. 1996).

Defendants cite *Prindable v. Ass'n of Apartment Owners of 2987 Kalakaua*, 304 F.Supp.2d 1245, 1257 (D. Haw. 2003), for the proposition that typically, waiving a no-pet rule to allow a disabled resident to have a service animal is a reasonable accommodation.  In *Prindable*, a case decided at the summary judgment stage, the Court held that a condo association did not violate the FHAA when it allowed a man who suffered from emotional disabilities to keep his service animal while it investigated the need for such an accommodation.  *Id.* at 1259–60.  The Court noted that the plaintiff "indirectly challenge[d]" certain restrictions the association had placed on the use of the dog, including that he take the dog out of the apartment using the shortest possible route.  *Id.* at 1259 n.29.  The plaintiff contended that further accommodations were necessary, including that he be able to take the dog through any portion of the building.  *Id.*  Although he agreed to use the shortest possible route, the plaintiff contended that the route was dangerous because he got dizzy spells and had fallen while taking this route.  *Id.*

The *Prindable* court rejected this argument, noting that the plaintiff was free to enter and leave the building as he chose as long as he was not accompanied by the dog.  *Id.*  The court reasoned

that "a service animal must be a reasonable accommodation, and nothing in the FHA precludes the imposition of appropriate rules and regulations designed to lessen the impact of housing a pet in a no-pet building." *Id.* As such, the court held, to succeed in his challenge to the limitations the association had placed on his use of the dog, the plaintiff would have to come forward with evidence that he had a disability that not only required the use of a service dog, but which also required him to take the path of his choice through the building. *Id.* Because he had not done so, summary judgment in favor of the association was appropriate. *Id.*

This case presents similar issues in terms of what limits a property manager is allowed to put on the possession of a service animal after it has waived the no-pet rule. Some limits, of course, are reasonable. After all, many residents choose to live in a no-pet building because of allergies, fear of animals, belief that such a building will have higher property values, or countless other reasons that are entitled to respect. As such, the Court agrees with Defendants that they were not required to capitulate to Plaintiffs' request for "unrestricted access," for the dog. Pls.' Compl. ¶ 43. The problematic aspect of this case lies in determining where to draw the line, and whether such a determination can be made at this stage of the case.

Plaintiffs rely on *Petty v. Portofino Council of Co-owners*, 702 F.Supp.2d 721, 731 (S.D. Tex. 2010), in which the court held that Plaintiffs adequately stated a claim under the FHAA when they alleged

that the building manager fined them after they obtained a service dog for their deaf son and sent them a letter stating that another one of their children could not take the dog out of the building to relieve itself. Defendants contend that *Petty* is distinguishable because Plaintiffs were never fined or precluded from having a dog in their unit, nor were they precluded from accessing all of the common areas of the building.

The Court agrees that the allegations in *Petty* are significantly different than the ones at issue here. Defendants allowed Plaintiffs to access the building through alternate entrances and as such did not completely deny Plaintiffs access to the common areas of the building. Further, Plaintiffs did voluntarily agree to keep the dog in a carrier, at least initially. Nor is the Court convinced by Mary Jo's protestations that the service dog needed to be on a leash, rather than in a carrier, at all times. As the previous district judge assigned to this case observed, it is difficult to understand how Mary Jo would have had better access to the dog if it was on a leash, which could extend several feet away, as opposed to in a carrier, where it could be held close to her body. *See* D.E. 26, at 4:24-5:7. At that hearing, Plaintiffs' attorneys responded that because of surgeries, Mary Jo could not lift anything in excess of 12 pounds, and the dog was about 10 pounds. *Id.* at 5:3-7. As the Court noted, however, lightweight carriers and smaller dogs were available. *Id.* at 5:8-25.

Further, the Court is highly skeptical that Defendants had any responsibility to control the behavior of other tenants who questioned Plaintiffs about the service animal, as uncomfortable as that may have been for Plaintiffs. That leaves the matter of what entrances Plaintiffs were required to use when accompanied by the service animal. Plaintiffs allege that they did not have keys to the north and south entrances, and that they were sometimes unavailable. They additionally allege that use of those doors put Mary Jo in close proximity to oncoming traffic, which increased her anxiety. Additionally, while it seems reasonable, on its face, for Defendants to have required Plaintiffs to use the service elevator when with the dog, the elevator's limited hours may be more problematic.

The question of whether Defendants restrictions on Mary Jo's access to the building's entrances and exits while with the service animal were reasonable is a thin thread upon which to hang a case, but the Court hesitates to resolve this issue without a more complete factual record. A key issue, which cannot be resolved at this stage of the case, is whether Mary Jo was required to have her service animal with her at all times. *If* Mary Jo was required to have her service animal with her at all times (or nearly all the time), *if* it was impossible to keep the dog in a carrier, and *if* Mary Jo was at times prevented or discouraged from entering or leaving her residence because of the restrictions that were in place, then it is possible that Defendants' accommodations did not go far enough. The question of whether an accommodation is reasonable is a question of fact

"determined by a close examination of the particular circumstances."
*Jankowski Lee & Assocs. v. Cisneros*, 91 F.3d 891, 896 (7th Cir.
1996); *Prindable*, 304 F.Supp.2d at 1254.

The Court, cautions, however, that Plaintiffs will have to
provide evidence to show that Mary Jo was disabled, that she needed
the dog to treat her disability, and that her disability made it
necessary for her to travel through the complex by the path of her
choosing. *Prindable*, 304 F.Supp. at 1259 n. 29. However, at this
point, the Court will allow Plaintiffs' claims under the FHAA and
IHRA for failure to provide a reasonable accommodation to go forward,
and Defendants' Motion to Dismiss Counts I and III is denied.

## B. FHAA Interference or Intimidation Claim (Count II)

In Count II, Plaintiffs seek to recover under 42 U.S.C. § 3617,
which makes it unlawful:

> to coerce, intimidate, threaten, or interfere with any
> person in the exercise or enjoyment of, or on account of
> his having exercised or enjoyed, or on account of his
> having aided or encouraged any other person in the exercise
> or enjoyment of, any right granted or protected by section
> 3603, 3604, 3605, or 3606 of this title.

Plaintiffs allege that Defendants violated this law by: (1)
refusing to provide the requested accommodations; (2) imposing
unreasonable restrictions on the Plaintiffs' ability to use their
residence; (3) refusing to notify residents of the presence of an
emotional support animal in the building; (4) refusing to
appropriately train management and staff; (5) monitoring the

Plaintiffs' comings and goings; and (6) repeatedly harassing and humiliating the Plaintiffs.

In order to succeed on such a claim, Plaintiffs must show that: (1) Mary Jo is a protected individual under the FHAA; (2) Plaintiffs were engaged in the exercise of their fair housing rights; (3) Defendants threatened, coerced, intimidated or interfered with Plaintiffs on account of their protected activity under the FHAA; and (4) Defendants were motivated by a desire to discriminate. *Bloch v. Frischolz*, 587 F.3d 771, 783 (7th Cir. 2009). Interference is more than a "quarrel among neighbors" or an "isolated act of discrimination," but rather is a "pattern of discrimination, invidiously motivated." *Id.* (internal citations omitted).

Defendants argue that Plaintiffs' claim fails because they have not adequately alleged either the third or fourth elements required to state a claim under § 3617. Indeed, most of Plaintiffs' allegations in regard to their interference claim amount to nothing more than a restatement of their failure to accommodate claim. The only allegations that perhaps go further are Plaintiffs' allegations that the staff of Hollywood Towers monitored their comings-and-goings and harassed them.

Even then, it makes sense that building employees in a staffed building would monitor who enters and leaves. Further, Plaintiffs' complaints of harassment by building staff center around the fact that they were given warnings of rules violations and confronted by Armenio about bringing her emotional support animal into the common

areas of the building.  Thus, it seems unlikely that Plaintiffs'
allegations of harassment and monitoring are enough to sustain a
claim under § 3617.  While neither the statute nor the legislative
history defines the minimum level of coercion or intimidation needed
to violate § 3617, *see People Helpers Found., Inc. v. City of
Richmond*, 781 F.Supp. 1132, 1136 (E.D. Va. 1992), these allegations
boil down to little more than a disagreement about whether Defendants
provided a reasonable accommodation.

However, the failure to provide a reasonable accommodation, by
itself, may amount to an interference with Plaintiffs' rights under
the Fair Housing Act if it is done with discriminatory intent.  24
C.F.R. § 100.400(c)(2); *see Bloch v. Frischolz*, 587 F.3d 771, 781
(7th Cir. 2009).  As such, it appears to the Court that the success
of Plaintiffs' § 3617 claim hinges on whether Defendants offered a
reasonable accommodation.  If they did, then there can be no claim
under § 3617 that they interfered with Plaintiffs' exercise of their
fair housing rights. But if they did not, and their refusal to grant
such an accommodation was motivated by invidious discrimination, then
they may prevail on this claim.

Defendants argue that Plaintiffs have not alleged that they were
motivated by invidious discrimination.  However, in the context of a
discrimination claim, plaintiffs are not required to plead facts that
establish the elements of their *prima facie* case.  *Whitley v. Taylor
Bean & Whitacker Mortg. Corp.*, 607 F.Supp.2d 885, 901 (N.D. Ill.
2009).  Plaintiffs allege that Defendants refused to provide them

with a reasonable accommodation, but overlooked the fact that other, non-disabled residents, kept dogs in the building. This raises at least a minimal inference that Defendants acted with a discriminatory motive. Because Plaintiffs' allegations are sufficient to put Defendants on notice of their claim, Count II may stand.

## C. Nuisance (Count IV)

Plaintiffs' private nuisance claim alleges that Defendants interfered with their access to their property and prevented them from taking certain routes through the building.

Illinois law defines a private nuisance as "a substantial invasion of another's interest in the use and enjoyment of his or her land." *Dobbs v. Wiggins*, 929 N.E.2d 30, 38 (Ill. App. Ct. 2010). "The invasion must be either intentional or negligent, and unreasonable." *Id.* (quoting *Willmschen v. Trinity Lakes Improvement Ass'n,* 840 N.E.2d 1275, 1282 (2005)). Whether a particular activity constitutes a nuisance is generally a question of fact. *Dobbs*, 929 N.E.2d at 39. What constitutes a nuisance "is incapable of any exact or comprehensive definition." *Shell Oil Co. v. Ill. Pollution Control Bd.*, 346 N.E.2d 212, 216 (Ill. App. Ct. 1976).

However, Illinois courts have traditionally defined the term in certain ways, none of which jell with Plaintiffs' claim here. Typically, a nuisance occurs when a property owner uses its own property in a manner which results in a non-trespassory invasion of another's interest in the use and enjoyment of his or her own land. *Kolstad v. Rankin*, 534 N.E.2d 1373, 1380 (Ill. App. Ct. 1989); *Great*

*Atl. & Pac. Tea Co., Inc. v. LaSalle Nat'l Bank*, 395 N.E.2d 1193, 1198 (Ill. App. Ct. 1979). In *Great Atl.*, relied upon by Plaintiffs here, the Court held that a grocery store that leased space in a shopping center stated a claim for nuisance against another leaseholder that planned to construct a drive-in bank which would have disrupted traffic patterns in the parking lot and deprive the grocery store of parking spaces. *Id.* at 1199. Plaintiffs argue that *Great Atl.* stands for the proposition that a disruption in their access to their property can constitute a nuisance under Illinois law.

However, this case arises in a significantly different context. Plaintiffs are not claiming that Defendants unreasonably used their own property, interfering in Plaintiffs' use and enjoyment of their home. Rather, they contend that Defendants, as managers of their condo, made rules that interfered with the Plaintiff's ability to use the common areas of the property as they wished. Plaintiffs cite no cases in which a condo owner was allowed to bring a nuisance claim because on the basis of rules imposed by the condo board. As such, the Court declines to stretch the tort of nuisance to reach this type of claim. *Cf. Cotton v. Duncan*, No. 93 C 3875, 1993 WL 473622, at *6 (N.D. Ill. Nov. 15, 1993) (refusing to allow nuisance claim to go forward where court would have to "innovate boldly in the name of the Illinois courts.") (internal quotation omitted). The Court dismisses Count IV for failure to state a claim upon which relief can be granted.

**D.  Intentional Infliction of Emotional Distress (Count V)**

Plaintiffs allege that they are entitled to recover for intentional infliction of emotional distress ("IIED") because Defendants "repeatedly harassed and humiliated [them], tracked their movements, imposed unreasonable demands and restrictions on their movements, and made them feel unsafe and unwelcome in their own home and inferior to the other residents of Hollywood Towers."  Pls.' Compl. ¶ 78.

To state a claim for intentional infliction of emotional distress ("IIED") under Illinois law, Plaintiffs must show that: (1) Defendants' conduct was extreme and outrageous; (2) Defendants intended to cause severe emotional distress or knew their conduct was highly likely to cause severe emotional distress; and (3) their conduct did in fact cause severe emotional distress.  *McGrath v. Fahey,* 533 N.E.2d 806, 809 (Ill. 1988).  "The law intervenes only where the distress inflicted is so severe that no reasonable man could be expected to endure it."  *Id.* (quoting *Restatement (Second) of Torts* § 46, cmt j, at 77-78 (1965)).

Plaintiffs' allegations are insufficient because Defendants' conduct was neither extreme nor outrageous.  Their allegations amount to a dispute over whether Defendants went far enough in accommodating Mary Jo's disability, an issue that will be decided as part of Plaintiffs' claim under the FHAA for failure to accommodate.  That Defendants brought alleged violations of the building rules to the Plaintiffs' attention is not enough to state a claim for IIED.  *See*

*Cavalieri-Conway v. L. Butterman & Assocs.*, 992 F.Supp. 995, 1010-11 (N.D. Ill. 1998) (holding that plaintiff failed to state a claim for IIED when, at best, she alleged that she had been subjected to a "couple of insults and the disfavor of building management"); *Roseborough v. Cottonwood Apartments*, 94 C 3708, 1994 WL 695516, at *3-4 (N.D. Ill. Dec. 9, 1994) (holding that failure to accommodate did not rise to the level of IIED).

Plaintiffs ask this Court to consider the authority that Defendants had over their living conditions in determining whether their conduct was outrageous. *See Kolegas v. Heftel Broad. Corp.*, 607 N.E.2d 201, 211 (Ill. 1992) (noting that outrageous nature of conduct may arise from defendant's abuse of power). They also argue that Defendants were aware that Mary Jo was particularly susceptible to emotional distress. *Id.* But while these factors are worthy of consideration, it is clear that Defendants' alleged actions do not meet the high threshold for extreme and outrageous conduct. Accordingly, Count V is dismissed for failure to state a claim.

### E. Constructive Eviction (Count VI)

Plaintiffs allege that Defendants' failure to provide a reasonable accommodation deprived them of the use of their condo and forced them to sell their home, resulting in a constructive eviction.

Generally, a constructive eviction results from a landlord's failure to keep the premises in a tenantable condition. *JMB Props. Urban Co. v. Paolucci*, 604 N.E.2d 967, 969 (Ill. App. Ct. 1992). It is unclear whether Illinois law recognizes constructive eviction

in the context of condo ownership.  This Court has found no Illinois cases addressing the issue, nor have the parties.

Plaintiffs rely in part on *Bloch*, in which the Seventh Circuit analogized to the common law of constructive eviction in examining a claim under § 3604(a) of the Fair Housing Act, which makes it unlawful to refuse to sell or rent "or otherwise make unavailable or deny" property to a person because of their religion.  *Bloch*, 587 F.3d at 776–77.  The Court held that § 3604(a) reaches post-acquisition conduct that compels the owner to leave the property. *Id.*  Citing *Bloch*, a California district court recently held that constructive eviction may occur outside the landlord-tenant relationship, although the court did not address the doctrine's applicability to condo owners.  *See Campos v. Bank of America, Inc.*, No. 11 C 431, 2011 WL 2600888, at *6 (N.D. Cal. June 30, 2011).

However, even if this theory is available, Plaintiffs' claim suffers from another problem.  Generally, there is no cause of action for constructive eviction unless the tenant surrenders possession of the premises within a reasonable time.  *JMB Props. Urban Co.,* 604 N.E.2d at 969.  If the tenant fails to do so, he is considered to have waived the landlord's breach of covenant.  *Id.*  The reasonableness of a delay is generally a question of fact, but can be a question of law if reasonable minds would reach the same conclusion.  *City of Chi. v. Am. Nat. Bank*, 408 N.E.2d 379, 381 (Ill. App. Ct. 1980).

Illinois courts have held that in determining what constitutes a reasonable time to abandon the premises, the court should consider whether the tenant relied upon promises of the landlord to fix the conditions at issue, as well as the time required to find new housing. *Am. Nat. Bank & Trust Co. of Chi. v. Sound City, U. S. A., Inc.*, 385 N.E.2d 144, 146 (Ill. App. Ct. 1979).

However, here, Plaintiffs do not allege that they relied upon promises by Defendants to offer a reasonable accommodation. In fact, the Complaint alleges that Defendants consistently and repeatedly refused to agree to their requested accommodations. By April 2010, at the latest, when Armenio responded to Plaintiffs on behalf of the Condo Board, it was clear that the Condo Board did not plan to reconsider its policies and grant the requested accommodations. Plaintiffs remained in their condo for more than a year after that and did not sell until July 28, 2011.

As part of his affidavit, Armenio averred that Plaintiffs put their home on the market for resale prior to requesting a reasonable accommodation, but it did not sell at that time. However, this Court cannot consider evidence outside of the Complaint in ruling on a 12(b)(6) motion without converting it to a motion for summary judgment. *See Miller v. Herman,* 600 F.3d 726, 733 (7th Cir. 2010). So the Court disregards Armenio's affidavit.

Even so, Plaintiffs' Complaint shows a significant gap between their request for certain accommodations and the sale of their condo. Having waited so long to move, they waived any right they may have

had to bring a claim for constructive eviction. *See Shaker and Assocs., Inc. v. Med. Techs. Grp., Ltd.,* 733 N.E.2d 865, 873 (Ill. App. Ct. 2000) (finding delay of 10 months in vacating premises after heating and cooling system malfunctioned was amounted to waiver of constructive eviction claim); *RNR Realty, Inc. v. Burlington Coat Factory Warehouse of Cicero, Inc.*, 522 N.E.2d 679, 685 (Ill. App. Ct. 1988) (finding no constructive eviction occurred when tenant waited 18 months after it lost parking lots to vacate the premises).  For these reasons, the Court dismisses Count VI.

### F.  Proper Parties

Because the Court is allowing Mary Jo's claims under the FHAA to go forward, it will address Defendants' argument that neither her husband nor Sudler Building Services are proper parties.

### 1.  Whether Ralph Stevens is a Proper Plaintiff

Defendants argue that Ralph Stevens is not a proper plaintiff because he has not suffered a "distinct and palpable injury" under the FHAA.  *See Thomas v. City of Chi.*, 155 F.Supp.2d 820, 823 (N.D. Ill. 2001) (noting that requirement for standing to sue under the Act is the "Art. III minima of injury in fact:  that the plaintiff allege that as a result of defendant's actions he has suffered a "distinct and palpable injury.") (internal citations omitted).

The FHAA makes it unlawful to discriminate in the sale or rental, or "otherwise make unavailable or deny" a dwelling to any buyer or renter because of handicap of the buyer or renter or "any

person associated with [a disabled] buyer or renter." 42 U.S.C. § 3604(f)(1)(C). The cases relied upon by Defendants show that concerned bystanders may not sue under the FHAA. *E.g.*, *Wilson v. Glenwood Intermountain Props., Inc.*, 98 F.3d 590, 596 (10th Cir. 1996).

However, Defendants have not cited, nor has the Court found, a case where the spouse of a disabled individual, who lived in the same home, was found not to have standing to sue under the FHAA. Clearly, such spouses have standing under the FHAA when they are denied the ability to rent property or when they are retaliated against for opposing discrimination. *See Grieger v. Sheets*, 689 F.Supp. 835, 840 (N.D. Ill. 1988); *Valenti v. Salz*, No 94 C 7053, 1995 WL 417547, at *3 (N.D. Ill. July 13, 1995).

The distinct and palpable injury to Ralph is perhaps less obvious in this case. However, to the extent Defendants refused to provide a reasonable accommodation to Mary Jo, their refusal also affected Ralph. *See HUD v. Ocean Sands*, 1993 WL 343530 (H.U.D.A.L.J. September 3, 1993) (holding that a *prima facie* case for failure to provide a reasonable accommodation can be made by "a person associated with a handicapped person"). As such, the Court finds that Ralph Stevens has standing under the FHAA.

### 2. *Whether Sudler Building Services is a Proper Defendant*

Defendants additionally argue that Sudler Building Services is not a proper defendant because it is a separate entity from Sudler Property Management, and only the later provides management services

to the condo board.  Defendants rely on FED. R. CIV. P. 21; however, that rule typically is used to cure defects in joinder.  *Xenakis v. Time Ins. Co.*, No 08 C 08-5225, 2008 WL 5397156, at *5 (C.D. Cal. Oct. 30, 2008).  Rather, the Court interprets this as an argument that the Complaint fails to state a claim upon which relief can be granted against Sudler Building Services because its conduct does not fall within the FHAA.

The relevant statutory provision makes it unlawful to "discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap. . . ."  42 U.S.C. § 3604(a).  In arguing that Sudler Building Services is an improper party, Defendants rely on an affidavit from Armenio, in which he states that he is employed by Sudler & Co., which owns and operates Sudler Property Management, which provides management services to the Hollywood Towers Condominium Association.  Sudler Building Services, Armenio avers, is a different entity and has no management responsibility over Hollywood Towers.  Rather, it facilitates services between Sudler Property Management and outside vendors for services such as cable television, window cleaning, and janitorial supplies.  As noted, however, the Court cannot consider the Armenio affidavit in ruling on a Rule 12(b)(6) motion.  *See Miller,* 600 F.3d at 733.

Plaintiffs have a more fundamental problem, however.  Their Complaint does not allege that Sudler Building Services discriminated

against Plaintiffs in their provision of services to Hollywood Towers. Plaintiffs seem to argue that the mere provision of services to a building where discriminatory conditions exist triggers liability under the statute, but cite no case law in support of this proposition. As such, the Court dismisses Sudler Building Services from the Complaint.

### IV.   CONCLUSION

For the reasons stated herein, the Defendants' Motion to Dismiss Plaintiffs' Amended Complaint [48] is granted in part and denied in part. Counts I, II, and III may go forward, but the remainder of the Complaint is dismissed. Additionally, Defendant Sudler Building Services is dismissed from the Complaint.

Finally, the Court denies as moot the Defendants' Motion to Dismiss Plaintiffs' Initial Complaint [28].

**IT IS SO ORDERED.**

_____
        Harry D. Leinenweber, Judge
        United States District Court

**DATE:** 12/29/2011